On January 15, 2008, Honeywell's defective flight management system nearly killed over 300 people on United Flight 901. The flight management system is referred to as the brains of the airplane. Pilots are trained to fly by their instruments. Those instruments are controlled by the brain, the flight management system. Honeywell contends that they should be let off the hook despite the fact that they produced a defective flight management system and despite the fact that they agree that had a Category 3 landing been done that day, Category 3 landing is simply an autopilot landing standard, happens most of the time for most airline flights. What would have happened in this case is catastrophe. That's not hyperbole. That's fact. When United went and tested this flight management system in their simulator, every single time a Category 3 landing was done, the plane crashed. How many times did they test it? Your briefing says every single time a lot. And I just wondered. I don't know the specific number. I know it was more than three times. It does seem to be uncontested in the briefing that that's the case. That's correct. Honeywell mischaracterizes the facts of this case by saying somehow this is standard or routine what happened here. I'd like to focus your attention on a concept that applies in this case to the pilots in this airplane at this time on this location. They have a map. That map tells them how to get to safety. The map depends on them knowing where they are starting. At the point that the pilots recognize that the flight management system is in error, that it is lying to them, that what they see on their instruments turns out to not be what is outside the airplane, they now know because of their training as pilots that their map of how to get out of there is also wrong because they don't know where their starting point is. At what point did your client realize that? At the moment when Captain Langelaar said go around. Well, the first time he said it, he said it in a quiet voice. And there's a So he said go around. And I think, and again, we're not entirely sure, I'm not even sure Captain Langelaar would know for certain, but I think part of it is the conditions at the time, not unusual for SFO, foggy conditions where they can't see most of the way. And again, under those conditions, a Category 3 landing was perfectly appropriate. So getting back to my question, he said go around and his deposition testimony is that he said it in a quiet voice. Right. And that your client responded by saying, huh, or something like that. Correct. And then he said it in a urgent voice. That's right. The other witness uses the term that there was urgency in his voice. And there's quite a long bit of deposition testimony asking him, I think, to his frustration about why did he give that direction. It's pretty clear in the testimony. It's not because they got down to minimums. He says that there was something wrong. And he says two things that I want to focus on. He said there was something wrong. He said it was his gut in part. He's very, very experienced pilot. But he said something was wrong. The other planes were getting in and I couldn't see any lights. So from that, I'm not sure. Monitoring radio traffic, it seems that if other planes, if there was fog across the runway, that that would have been fog for everybody and the other planes wouldn't have gotten in. I mean, that's what I'm understanding the captain to be saying. But he's got fog. So was there any testimony in the record anywhere over that the fog was over the bay and that's why the other planes were able to get in? No. So what's that mean? Can you help me with that part? Sure. The other planes didn't have defective flight management systems. So they were landing on instruments, not visual. They could have been landing on either. But as they were coming in, their flight management system was not lying to them. So go ahead, please. I was just going to say when the flight management system, when they looked at their controls and they see that the plane is lined up with the runway, it turns out the plane is lined up with the runway. And just like their train, they rely on that. These pilots had a flight management system that said, you're lined up with the runway. And it wasn't until the very last seconds that they realized when they saw the blue beaker light to the left, which should have been on the right, meant they were about to go into the water. Okay. So here's why I'm asking the question. To be clear, there's a suggestion in the briefing, and it's not a subtle suggestion, that this would have happened, that Mr. Taylor would have experienced this, you know, looking down and seeing the white caps, whether the instruments had failed or not, because there was fog that day. And I'm trying to make sense of the district court's order. The district court seems to have a problem with causation about whether this would have, the go-around would have been required anyway. No. No. Had the plane, had the plane been where the flight management said it was, this plane would have landed. This plane would have landed at SFO. On instruments. Well. Because we can't tell from the Record Council what the conditions really were. Fair enough. We don't have that. So this landing is a combination of instruments plus pilots. So the instruments are working to tell you where you are, and the pilots are actually physically landing the plane. That's a Category 1 in this particular case. Category 3, the machine does it all. Pilots sit there. They literally aren't even touching the controls. They're just sitting there, looking at the instruments, and the plane lands itself. So on a Category 1, the instruments are telling you where you're going. You're relying on those. You look to see the runway ahead of you. When you see it, you go ahead and continue and you land. A typical go-around where a problem occurs, and the reason there's this requirement that you see the runway in front of you, is because of really three main issues. There's more, but there's three main ones that come up for air flight. The first is, as you're coming in, you realize that you're coming in at the very tip, the very end of the runway. You're too shallow. And there's some fear that you might clip. You go around. So you come up so you can land further into the runway. The second is, you're too deep on the runway, and you've got a short runway where you don't think you're going to have enough room to stop. And the third is, when you look out at the runway, you can see down the way there's a plane crossing. There's a car that's stopped. Some kind of problem on the runway, and you do a go-around. In all of those cases, when you pull up on the plane, on the yoke, the worst thing that happens is you go around, you stop for a while, and you take back off. That's not the circumstance here. There's no runway to hit. They're told they're lined up on the runway, but they're not. When did your client realize that? When Captain Langelaar said, go around. Well, the first time he said it quietly? No, I think this, well... He looked out. His testimony, Mr. Taylor's testimony is that he looked out and he saw white caps. His testimony from other witnesses that I saw that where he, they relate him saying that he saw a hanger. Is there a place in the record I'm missing where he testified to that? Where he testified to, I'm sorry, to... To recognizing that the runway was 1,000 feet over there. No. I couldn't find it. So the position in the airplane is, Taylor is on the right, that's our client, my client. Langelaar's on the left. The runway turns out to be over to the left. What is straight ahead of them is runway 10, which is the perpendicular runway to runway 28 that they were supposed to be landing on. So if he could see anything, what he would have seen would be the gigantic united hanger on the far side of runway 10, runway 10, and the break wall, which is those rocks, if you've ever landed at SFO on 28, you've seen them. That's what would have been ahead of him. To his right would be white caps. It would be white caps regardless. But the question... I'm trying to escape the district court's attention, and so I'm trying to, since your claim is essentially for emotional distress, that's why I'm asking, when did he realize what's your, what's the pivot point for your damages? And I think the pivot point is at the point when Captain Langelaar says, go around that second time, Mr. Taylor realizes they are not where the brain of the airplane has told them they are, and he now has to make a, he has to perform a procedure to get out of there not knowing if the brains of the plane are going to respond or not. When did he realize that the machine wasn't working the way it's supposed to work? At the, when, certainly by the time Captain Langelaar said, go around the second time. Because there was, it's not because he could see anything, it's because of the urgency in the captain's voice, or what was it? Well, no, he could see. He could see, I mean, he could see the white caps, he's... But that would have been true even if it had been a quote-unquote routine go around. That's what I'm trying to get at, counsel. Fair enough. And let me, I'm running out of time. Let me just say this. These, all of these pilots were very experienced, not just Captain Langelaar, same with Officer Taylor. Once you've done something hundreds of times, perhaps thousands of times, you know generally speaking where things should be. When you look out and you see white caps and you see Runway 10, which would be those things to his right, you have a sense of where you are or where you aren't. And for Captain Taylor, at that moment, it would have been clear to him he was not over the runway. Clear to Captain Taylor. Clear to Captain Taylor, that's correct. First Officer Taylor, technically, but yes. So, I would like to reserve some time, but I also want to make sure I've answered your... Okay, why don't we hear from the other side and then you can have some time. May it please the court, Benjamin Fox for Honeywell International. There was no error below. The district court correctly articulated and applied the rule that emotional distress without a threat of physical injury does not make for a claim. So you say there was no danger here? There was no danger. And the reason why... And then why, after the first go around, they're up 5,000 feet, Captain Langlar says he was trembling. So he's trembling because there had not been any danger? He's just trembling just because? I acknowledge that there was uncertainty and there was fright in the cockpit. So an experienced pilot, the captain, Captain Langlar, says go around because his gut tells him something's wrong when they're at about 350 feet. Captain Taylor says, huh, so he didn't respond immediately. He then says it in an urgent voice. Captain Taylor does respond. And by the time the plane has come to its lowest point and starts back up again, they see white caps, they see the hangar, they realize they were going to, quote, land 1,000 feet to the right of the runway. They get up 5,000 feet and Captain Langlar is trembling and you say there was no danger? I agree that they were afraid. But that does not make for an emotional distress claim. No, no, I'm on the question of danger. You're saying there was no danger? The reason there was no danger and the reason... So you're saying there was no danger? There was no threat of a crash. No, I used the word danger. Was there no danger? I believe there was no danger. And the reason why... And there was no threat of a crash? Correct. Okay. And the reason why is that the go-around was required by FAA regulations and it was initiated above the decision altitude. So this is a matter... Why was it required? It was required by FAA regulations because the pilot could not see the runway at the decision altitude. So... Why were the other planes getting in there? It goes back to my very first question of opposing counsel. Yes. This very experienced captain said something's wrong. Other planes are getting in and I can't see anything.  Couldn't get any lights. I don't know. And there's nothing in the record about that. I think that the other pilots, when they reached the decision altitude, could see the runway, so they were permitted by FAA regulations to land. But isn't that the problem? That's what I was trying to get at from your brief. You're arguing pretty hard that this was all about fog, right? That's why you think that this would have gone just the way it would have gone whether your machine had failed or not. Am I misreading that? I'm arguing that it's about altitude. My question was a yes or a no, just to help me out. Is that wrong? It is in part right. Okay. There was fog, but also there was a go-around above 200 feet and the reason was it was required because the pilots could not see the runway. So a crash into the bay is with alignment, right? So you would agree the captain is very clear in his deposition testimony. He didn't get down to decision altitude. He called it earlier. Correct. And he called it because he said something was wrong in my gut. The other planes are getting in and I can't see lights. Or did I miss something else? I think he was required to because they could not see the runway. That is ---- Do you mean you think they would have been required had they gotten down to decision altitude? Because he says they didn't. By the decision altitude, if the runway is not in view, they needed to go around. Okay. And they never got that low. He called it earlier, right? I believe so, yes. Well, he's clear on that in his deposition testimony. Is there conflicting evidence on that point? I don't think so. So ---- Can you help me get something straight? Sure. When you say he could not see the runway, if you're 300 yards to the right of the runway, you're not going to see the runway no matter how close you get to the surface of the earth. Yes, that's correct. So what does fog have to do with it? I thought that the captain's reaction was sort of based on a notion that the earlier planes could see lights before they reached the minimum. Yes. Let me try ---- And, therefore, he was drawing the inference based on his experience, you know, we're getting pretty close and I still don't see any lights. That was what his gut was telling him. That's how I read the record. My gut's telling me that we're not where we think we are. I think ---- Because I don't see anything out there. And, eventually, they saw the water. So do I have that right or wrong? I think that is correct. And let me take the hypothetical in a no-fog situation. In a no-fog situation, whether you are misaligned by 500 or 1,000 feet, you will see the whole area and you will see that the runway is to your right and you will redirect. In a fog situation ---- We have two proximate causes. That's perfectly sensible, flat-letter, first-year torts, negligence law. We have ---- Yes. Yes. And the Court says ---- But you're arguing that as a matter of law, the fog negates the possibility of a second proximate cause. Well, not a proximate cause of a crash. The alleged defective equipment. Yes. And Ehrlich and Potter and the other cases we have cited said that there is not a claim for emotional distress damages every time there is a claim for negligence. Well, of course. Nobody disputes that. So it doesn't mean there is an emotional distress claim. But there is no law that says for an emotional distress claim for negligent infliction, you can only have one ---- you are limited to one proximate cause. What we are saying is that there was no threat of a crash. Why not? Why not? Because the plane turned around above the decision altitude. So the hypotheticals that the plaintiff gives, there could have been a mountain in the way. There could have been some other obstacle. That was not a fear of Mr. Taylor's based on his testimony. And that is devoid of any facts. So the fear that he had was going into the bay. But that was not going to happen. He avoided the harm because the plane didn't crash. The question is whether he avoided the threat of harm. And it seems very clear they didn't avoid the threat of harm. It goes to Judge Fletcher's question. Right? There was a threat. There was a risk. It was a very dangerous situation, counsel. Well, my view is there was not a threat in the same way that in Wilson, the recent California Court of Appeal threat, there was no threat of electrocution. Although there was stray voltage, that is not something that permits an emotional distress claim. And I think that ---- You seem to be likening this to the cases where somebody is lucky enough that they can jump out of the way of a speeding car and they don't get hit. And that's, on one hand, a really good thing because they don't get run over. But are you saying under this circumstance where they essentially jumped out of the way because the captain said, my gut tells me something's wrong here, that there's no threat? This is not like the cases where there was a car crash and the bystanders were standing there and it just so happened luckily we're not hit because there was not a crash here. This is like the fire. No, but it is like those cases. I agree there wasn't a crash. That's my hypothetical. If you could maybe hone in on it, it would help me. Sure. It is like those cases in that the plane didn't crash, the pedestrian didn't get run over, but the pedestrian had a very close call, and that's compensable. Why isn't this compensable in the same way, or at least potentially compensable? Why is it a summary judgment against Taylor? The difference between this case and the boat narrowly missing the other boat and then crashing into the boat after it, the difference between this case and the car crash or the midair plane crash where material falls is that here there was a Federal regulation that required a go-around, that if followed, and there's testimony that's uncontroverted, that he trained for it, he practiced it, the captain would have performed it if he hadn't. Getting back to your position. Forgive me for interrupting, but this is the part you keep glossing over, and I just want to make sure I'm understanding you. And I'm not trying to. I didn't mean to ascribe any intent. But I think what you mean is there a Federal regulation that your client contends would have required them to do a go-around had they gotten down to decision altitude. They didn't get down to decision altitude here. Where you're losing me is you're repeatedly saying that there's a Federal regulation that required this go-around. That's different. I believe that the regulation requires a go-around in these circumstances. In this circumstance? In this circumstance, yes. They weren't at decision altitude, so what am I missing there? I believe that the regulation requires going around before the decision altitude, which is what they did. If you wait until after, you know, regulations are not written to have the ‑‑ it's called decision altitude because you're supposed to do it before the decision point, not after it. So I think that there was complete compliance. Isn't that the point at which the decision must be made? Isn't that why they call it the decision altitude? Yeah, at or before. Because we're dealing with a descending aircraft, people cannot make a decision right at that point. I think it has to be made before. And you agree that the testimony here from the captain is that that's not why he ordered the go-around? I don't think that's right. I think that there's acknowledgment that the rules required a go-around, yes. And he did say there was something that did not feel right to him. He said first something expressing frustration along the lines of I've been asked this question about 600 times, I think, right? Right. And then he said something wasn't right. He talked about his experience and his gut as a very, very experienced pilot, said the other planes were getting in and I couldn't see lights. Did he say anything else? I don't remember. But I think his justification doesn't matter as a matter of law. They performed the go-around when they were supposed to and required to. Let me ask you this about the regulation. The decision point was apparently 213 feet, but adjusted for atmospheric conditions, it was 220 feet. So the decision point operates in the sense that if you're at 220 feet and you don't see the runway, at that point you're supposed to, that's the last point at which you're supposed to initiate the go-around. Is that right? Right. And we know that, and we got this, I think, out of Captain Langlar's testimony in the deposition, that once you initiate the go-around, the plane continues to descend for a bit because it's coming down, it takes a while for the engines to go faster and so on. Now, if they had been off course to the right, as they were, and over that big hangar that's off to the right, and they had made the decision point, they had actually exercised the go-around more or less at the decision point, at 220, 225 feet, would they have hit the top of that hangar? That's a pretty big hangar. The answer is I don't know, and it's a hypothetical. I don't either. But I'm trying to figure out what danger there was from them being off course to the right by a substantial amount. There are obstacles and buildings over there off to the right. I mean, I'm trying to figure out the degree of danger that the air-defective system put them in. And we look at the record, and the record is that they were over the bay, not that they were near any hangar or any other obstacle. In a summary judgment, we need evidence, and there was no evidence of any obstacle. The action team to the right of the runway they were coming in on basically does take you over in that direction. I don't know whether they were actually over the bay or whether they were right at the edge of that other runway that goes off that direction toward Oakland. They're very close to the end of that other runway if you're 1,000 feet off. And, Your Honor, there is no evidence in the record that they were anyplace else but over an open bay. That's what the evidence is. Unless the court has other questions, I'm happy to address any of the cases. In my view, the law, we're dealing with threat. The court has asked whether there is a threat. I've done my best to explain why I think there was not. I'll submit. Okay. Thank you. Thank you. You've saved some time. Honeywell wants us to go look at what happened in the past with the benefit of knowing what we know now as opposed to looking at the circumstance that Officer Taylor, Captain Langlar, and Officer Fritsch were in at the time this accident happened. They want us to have a retrospective perspective. But that's not what the law says. The law says you take folks and the condition they're in at the time that they're in it and figure out whether it's reasonable that they perceive there to be a danger. And if you look at the pool case, which I think is instructive, it's a Supreme Court case, it says specifically that reasonableness of whether there was a danger is a jury question, just like foreseeability is. But Honeywell wants there to be a rule that says if you're a trained pilot and you do a go-around, regardless of the circumstances, they get a free pass. Because of the pilot's training? That seems to be, if you look at the court below, at the reasoning there, that seems to really be the motivating factor. There's a certain surface plausibility, if not attractiveness, to that notion, right? It's almost, I'm not going to go to any analogies, but you haven't found any case any close to this, right? Of a professional airline captain or pilot? No. Who claims emotional damage from what happens in a plane? I think, well, certainly there are plenty of examples. I don't know if there's cases necessarily. We haven't looked specifically for that as to whether there are pilots who have claimed post-traumatic stress disorder as a result of incidents that happen on a plane. We have plenty of examples of that that have happened all around us. No, actually, safe landings as well. Safe landing. That's right. In the trial court, did you, I think I remember that you briefed the citations about the eggshell plaintiff notion? Right. Because there seemed to be a suggestion that the reaction here was quite atypical. So I guess my first question is, am I right that that was discussed at the summary judgment level? Yes, that's correct. And if you look at the cases that we've cited, too, first of all, for anybody to say that Mark Taylor is an eggshell plaintiff, I think misstates it a bit. What we know about post-traumatic stress disorder from all of the literature that's out there, including what we've learned most recently from our most recent war, is that post-traumatic stress disorder happens to people who we think of as war heroes, who are tough. And so the eggshell plaintiff doesn't quite capture it. What is happening to them? Except he would have been screened out. If there were a screening process, United is not going to put anybody in the cockpit knowing that there's a likelihood that they would be subjected to this kind of reaction. I think we can all agree with that. I would agree. And in fact, there is no — In any disrespect by suggesting the old eggshell plaintiff, it's a shorthand way — Nor do I mean any disrespect. Right. It's just a shorthand way of getting at the legal point that we're trying to address. Let me ask you this. I think there are five experts that testify that Mr. Taylor has post-traumatic stress. There is no dispute about that. And that was my question. None. United will not let him fly because of it. So there is no screening test that anybody is aware of or the U.S. Army, the U.S. Marines, the U.S. Navy would be using it right now to screen out people who would be susceptible to PTSD. There is no test because we don't know who's going to get it. We don't know when they're going to get it. And we know that you put two people in the exact same circumstance, there is a high likelihood under certain circumstances, particularly war, where one person is going to get PTSD and another isn't. Is it in the record that United won't let him fly because of this, because of his current psychological state? I believe, yes, I believe it's in First Officer Taylor's deposition testimony. It's an allegation in the complaint. I don't. I'm sorry. I do not know. We'll just check. All right. Thank you. Okay. Thank you. Thank both sides for their argument. Thank you. Taylor versus Honeywell International now submitted for decision. Thank counsel for both sides for their arguments.
judges: Davis, Fletcher, Christen